UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEFFREY D. JOHNSON,                    )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )     No. 05 C 3836
                                       )
SIEMENS BUILDING TECHNOLOGIES,         )     Judge Rebecca R. Pallmeyer
                                       )
            Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeffrey Johnson worked for Defendant Siemens Building Technologies ("Siemens") from 1994 until his termination in 2004. In this suit, Johnson alleges that Siemens discriminated against him on the basis of his race and gender in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000, and 42 U.S.C. § 1981 by rejecting his requests for training and work hours to accommodate his child care schedule. Johnson further alleges he was suspended and later terminated by Siemens in retaliation for protesting unlawful employment discrimination. Finally, Johnson brings a claim of retaliatory discharge in violation of Illinois common law, alleging that Siemens discharged him because he reported to the EEOC that Siemens had submitted false documents to the State of Illinois. Siemens now moves for summary judgment, and, for the reasons set forth below, the request is granted.

## FACTS

Plaintiff, an African-American male, was hired on July 5, 1994 by Landis & Gyr Powers, Inc., which was acquired several years later by Siemens. (Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment (hereinafter "Def.'s 56.1) ¶ 1.) Plaintiff was originally hired as a warehouse material handler, and remained in that position until he suffered a wrist injury, which necessitated light duty work. (Johnson Dep., Ex. A to Plaintiff's Statement of Additional Material Facts (hereinafter "Plaintiff's 56.1"), at 31.) Plaintiff spent

approximately seven months working light duty in customer service, (*Id.* at 29.), before transferring to the domestic traffic department in 2000. (Def.'s 56.1 ¶ 1.) The traffic department, part of the Siemens logistics group, takes in component parts from suppliers, where they are then stored, manufactured into a finished product, marketed and sold by other Siemens departments, and ultimately shipped by the traffic department to customers around the world. (Johnson Dep., at 20; Kentfield Dep., Ex. F to Plaintiff's 56.1, at 6-7.) Siemens maintains both a domestic and international traffic department. (Def.'s 56.1 ¶ 2.) The domestic traffic department handles shipments to the United States and Canada, and the international traffic department handles shipments to the rest of the world. (Johnson Dep., at 21-22; Kentfield Dep., at 29.)

Plaintiff was employed in the domestic traffic department in a position referred to as traffic coordinator or logistics coordinator. (Plaintiff's 56.1 ¶ 1; Kentfield Dep., at 17.) His duties in that position included "performing" consolidation reports, tracking shipments in the domestic traffic department, and training new hires. (*Id.*) His usual work hours in the traffic department were from 8:00 a.m. until 4:45 p.m., a 40-hour work week. (*Id.* at ¶ 4.) When Plaintiff first transferred into the domestic traffic department, his immediate supervisor was Clifton Salonis, an African-American male. (Def.'s 56.1 ¶ 3.) Salonis remained Plaintiff's immediate supervisor until October 23, 2003, when Alexander Kentfield, the director of logistics, reclassified Salonis to the position of traffic specialist. (*Id.*; Kentfield Aff., Ex. J to Def.'s 56.1 ¶¶ 4, 6.) Kentfield then served as Plaintiff's direct supervisor from October 23, 2003 until January 2004, when Siemens hired Art Hurtado as traffic manager. (Def.'s 56.1 ¶ 5.) As traffic manager, Hurtado was in charge of both the domestic and international traffic departments. (Hurtado Dep., Ex. C to Plaintiff's 56.1, at 9.) Plaintiff and Salonis were joined in the domestic traffic department in March 2004 by Joanna Zaucha, a white female who transferred into the department full time after previously assisting part time in the department for several months. (Def.'s 56.1 ¶¶ 7, 41.) Plaintiff, Salonis, and Zaucha reported to Hurtado, and Hurtado reported directly to Kentfield,

2

who supervised the entire traffic department.  (*Id.* at ¶ 9; Hurtado Dep., at 8-9; Plaintiff's 56.1 ¶ 3; Kentfield Dep., at 7.)

**Plaintiff's Work Performance and Disciplinary History Prior to 2004**

On April 19, 1999, when Plaintiff was still working in Siemens' warehouse, he and another warehouse employee, Gilberto Tovar, engaged in a verbal and physical altercation on company premises. (Def.'s 56.1 ¶ 18; Notice of Suspension April 20, 2000, Ex. H-20 to Def.'s 56.1.) Siemens' policy, as stated in the employee handbook, is that an employee who is involved in any type of physical violence is to be terminated. (Def.'s 56.1 ¶ 19; Notice of Suspension April 20, 2000.) Plaintiff's then-supervisor, Rigoberto Sixto, determined, however, that because Plaintiff and Tovar each claimed to have been defending themselves and because there were no witnesses to the incident, it would be unfair to terminate them. (Def.'s 56.1 ¶ 19; Notice of Suspension, April 20, 2000.)  Instead, Sixto suspended both Plaintiff and Tovar for five days. (Def.'s 56.1 ¶ 18.) Sixto sent each a disciplinary letter warning that "any verbal or physical threats of violence towards each other, or anyone else in the Company, by either individual involved in the incident, will result in his immediate termination." (Notice of Suspension, April 20, 2000.) Plaintiff admits that he signed the letter, signifying his agreement to these terms. (*Id.*; Johnson Dep., at 231.)

Soon after Plaintiff transferred into the domestic traffic department, he began having difficulties with his supervisor, Clifton Salonis. (Def.'s 56.1 ¶ 21.) On Plaintiff's first performance review as a traffic coordinator, for the year 2000–2001, Salonis wrote under the "Long Term Development Recommendations" section that "Jeff will have to be instructed in how to be less defense [sic] in his response to management/supervisor instruction and direction, as he tends to take this as a personal criticism. I will work with my manager and human resources to identify an appropriate class for Jeff." (*Id.*; Performance Appraisal, 2000–2001, Ex. H-14 to Johnson Dep.) Plaintiff's work performance itself was rated as "Good," a rating given to those "whose

demonstrated performance clearly meets all the requirements of the position in terms of quality and quantity of output." (Performance Appraisal, 2000–2001.) His performance was again rated "Good" the following year. (Performance Appraisal, 2001–2002.) In this review, he acknowledged his difficulties with his co-workers, stating that "[w]ith the cooperation of my co-workers I will make a conscious effort to maintain a professional atmosphere and actively share in the task of maintaining a clean and organized work area." (Def.'s 56.1 ¶ 22; Performance Appraisal, 2001–2002, Ex. H-13 to Johnson Dep.)

Plaintiff does not deny Defendant's contentions that he had difficulties and disputes with Salonis; he notes, instead, that Salonis had daily conflicts with everyone in the department. (Plaintiff's Response to Defendant's Statement of Undisputed Facts (hereinafter "Plaintiff's Response") ¶¶ 21, 27.) Indeed, both Rigoberto Sixto and Sam Cade, a senior Human Resources coordinator for Siemens, (Def.'s 56.1 ¶ 11), testified that they also found Salonis to be rude, disrespectful, and belligerent at times. (Sixto Dep., Ex. G to Plaintiff's 56.1, at 12-14; Cade Dep., Ex. E to Plaintiff's 56.1, at 55.) Salonis was given a disciplinary warning in 2002 for being verbally abusive towards his subordinates, (Cade Dep., at 51, 54), and was placed in a "360-degree feedback program,"a program in which a Siemens employee is evaluated by his or her peers, and then works together with Human Resources to improve on any problematic behavior or other negatives specifically identified in the peer evaluations. (*Id.* at 52-53.)

On October 18, 2002, Plaintiff was involved in an incident with a cafeteria worker. (Def.'s 56.1 ¶ 24; Johnson Dep., at 220.) In a written record of a verbal warning to Plaintiff regarding the incident, Kentfield stated that two Siemens supervisors reported that they and other Siemens employees witnessed Plaintiff verbally abusing a cafeteria worker. (Def.'s 56.1 ¶ 24; Interoffice Letter from Kentfield to Johnson of 10/23/02, Ex. H-17 to Def.'s 56.1) The supervisors told Kentfield that Plaintiff loudly insisted that he be given credit for a bagel that he had already cut, toasted, buttered, and paid for, because he forgot that free food was available.

4

(Interoffice Letter from Kentfield to Johnson of 10/23/02.) Plaintiff also reportedly protested that the cafeteria worker would treat him differently if he were Nick Fowler, the vice president of Siemens. (Id.) Kentfield told Plaintiff in the memo that the Siemens' supervisors reported this incident because they were "embarrassed by your actions as a fellow Siemens employee." (*Id.*) The memo reminded Plaintiff of Siemens' "Respectful Workplace" policy, which requires all employees to be respectful towards all other people at all times while on Siemens premises, while conducting company business, or at any time while representing the company, and warned that Plaintiff's actions crossed this line. (*Id.*) The memo warned that "[s]hould there be any further incident, a written warning and further disciplinary action, up to and including dismissal, if warranted by the circumstances, may result." (*Id.*) Plaintiff admits that his signature appears on the bottom of this memo. (*Id.*; Johnson Dep., at 219.) He also admits that Siemens has a "Respectful Workplace Policy," but identifies ten incidents in which, in his view, employees violated that policy without any repercussions.[1] (Def.'s 56.1 ¶ 14; Respectful Workplace Policy, Ex. I-17 to Def.'s 56.1; Plaintiff's Response ¶ 14.)

Plaintiff does not believe that anyone reported this incident to Kentfield other than Plaintiff himself; he claims that he went to Kentfield immediately after the incident and told him what had happened. (Johnson Dep., at 222.) In Plaintiff's version of the incident, Plaintiff felt that he was being overcharged for his purchase and the cafeteria worker became angry when he questioned her about the price, so he asked for a refund. (*Id.* at 224.) The cafeteria worker became he understands that confrontational and refused to give him a refund, even after Plaintiff asked to speak with her supervisor. (*Id.*) Plaintiff then went immediately to Kentfield to report the incident, because he understands that when a Siemens employee has a dispute with a cafeteria worker, he or she is supposed to report it to their supervisor so that the issue can be

---

[1]    To the extent that Plaintiff also cites several of these incidents as proof that he was treated less favorably than other Siemens employees, the court addresses them below.

documented. (*Id.* at 224-225.) Plaintiff contends that Kentfield embellished the incident because he was angry about the fact that Plaintiff had circumvented Kentfield and gone directly to Human Resources regarding a dispute that Plaintiff was having with Salonis. Plaintiff recalls that Kentfield spoke to Plaintiff about this in a threatening way immediately before the incident with the cafeteria worker. (*Id.* at 220-221, 225.)

The difficulties between Plaintiff and Salonis continued into 2003. Plaintiff and Salonis were unable to work together productively despite constant oversight from Kentfield. (Def.'s 56.1 ¶ 27; Kentfield Aff. ¶ 4.) Finally, in October 2003, Kentfield made the decision to remove Salonis from his supervisor position and to reclassify him as a traffic specialist. (Def.'s 56.1 ¶ 27; Kentfield. Aff. ¶ 4.). On October 22, 2003, Kentfield counseled both Plaintiff and Salonis about their difficulties in working together. (Kentfield Aff. ¶ 5.) The next day, Kentfield sent Plaintiff and Salonis an e-mail reiterating his concerns, warning that the behavior would no longer be tolerated, and formalizing Salonis' demotion. (Def.'s 56.1 ¶ 27; E-mails from Kentfield to Johnson and Salonis, 10/23/03, Ex. H-24 to Def.'s 56.1.) Kentfield directed both Plaintiff and Salonis to report directly to him and cautioned that "any further disruption of this nature will result in formal disciplinary action up to and including termination of employment." (*Id.*) Plaintiff's and Salonis' offices were also moved to increase their physical separation. (Def's 56.1 ¶ 28.) Though both Plaintiff and Salonis reported to Kentfield, Salonis, as a traffic specialist, continued to perform several additional functions. (Defendant's Supplemental Statement of Undisputed Facts in Support of its Motion for Summary Judgment (hereinafter "Def.'s Supp. 56.1) ¶ 4.) Specifically, Salonis served as the system administrator for the desktop shipping system, which assigned certain UPS accounts to various Siemens employees, and he was responsible for freight analysis, which involved preparing monthly reports on outbound shipments. (*Id.*; Kentfield Supp. Aff., Ex. K to Def.'s Supp. 56.1 ¶ 3; Johnson Dep., at 26-27.)

Plaintiff's performance report for 2003–2004 reflected the October 2003 incident. Kentfield wrote that "[o]ur respectful workplace policy requires, at all times, that employees do their utmost to work in a tolerant and cooperative manner. There was a severe disruption of this work ethic in October, which has had severely negative effects on [Plaintiff's] work relationships, work processes and productivity in the department." Plaintiff's overall work performance grade was rated "Good Minus." (Def.'s 56.1 ¶ 36; Performance Appraisal, 2003–2004, Ex. H-12 to Def.'s 56.1.)

**Overtime**

The domestic and international traffic departments are responsible for a heavy work load, and overtime work is sometimes necessary to cover business needs. (Def.'s 56.1 ¶ 15; Kentfield Dep., at 9-10; Cade Dep., at 12.) The traffic department has a policy that if overtime is needed, management first seeks volunteers to work overtime. (Def.'s 56.1 ¶ 16; Kentfield Dep., at 9.) Traffic department employees have the option to decline a request from management to work voluntary overtime. (Cade Dep., at 12.) If the department cannot cover its business needs through voluntary overtime, however, management may schedule employees to work mandatory overtime. (Def.'s 56.1 ¶¶ 15, 16; Kentfield Dep., at 9.) Failure to perform mandatory overtime can lead to consequences as severe as termination of employment. (Cade Dep., at 12.) Plaintiff contends that he was unaware that overtime was a job requirement of traffic department employees prior to taking the position. (Johnson Dep., at 97.) He acknowledged that his job was not made more difficult by the need to work occasional overtime and that the fact that he had to occasionally work mandatory overtime did not jeopardize his potential for promotion. (*Id.* at 100.) Working overtime did, however, interfere with his ability to pick up his daughter from daycare. (*Id.* at 96.) Plaintiff claims in this lawsuit that Defendant forced him to work overtime and failed to accommodate his childcare schedule on the basis of his race and gender.

In August 2003, Maria Lopez, a member of the domestic traffic department, was transferred to the international traffic department, leaving the domestic traffic department short-staffed. (Kentfield Aff. ¶ 3.) Joanna Zaucha, who at the time was working in Siemens' production area, was asked to fill in for a few hours a day in the domestic traffic department to help the department keep up with its work. (Def.'s 56.1 ¶¶ 6, 25; Kentfield Aff. ¶ 3.) Even with her help, however, management still needed overtime work from Plaintiff and Salonis on a regular basis to help meet shipping requirements. (Def.'s 56.1 ¶ 26; Kentfield Aff. ¶ 3.)

In the October 23, 2003 e-mail admonishing Plaintiff and Salonis about their poor working relationship and formalizing Salonis' demotion, Kentfield also notified Plaintiff and Salonis of the need for them to work overtime because the department was short-staffed. (E-mails from Kentfield to Johnson and Salonis, 10/23/03.) When Plaintiff asked whether he was still allowed to ask Zaucha for help, Kentfield responded by telling Plaintiff that the traffic department needed to reduce its use of Zaucha because she was working in the department up to four hours a day, which was far more than what had been intended. (*Id.*) Kentfield also reiterated the need for Plaintiff and Salonis to work overtime due to staff reductions and increased business needs. (*Id.*) Plaintiff replied by telling Kentfield that he could not work overtime unless he had sufficient time to arrange to have someone pick up his daughter from daycare before 6:00 p.m. (*Id.*; Plaintiff's 56.1 ¶ 8.)

The following day, October 24, Plaintiff filed a complaint of "retaliation and unfair treatment" with Sam Cade and Cade's supervisor Jim Cooper, the Senior Director of Human Resources, (Def.'s 56.1 ¶ 12), in which Plaintiff alleged that Kentfield was forcing him to work overtime in retaliation for Plaintiff's having requested that Kentfield move his office away from Salonis'. (Def.'s 56.1 ¶ 29; Johnson Claim of Retaliation and Unfair Treatment to Cade and

Cooper, Ex. H-23 to Def's 56.1.)[2] The complaint further stated that Kentfield ignored an incident in which Salonis slammed a door into Plaintiff's foot so hard that it tore the sole off of his shoe. (Johnson Claim of Retaliation and Unfair Treatment to Cade and Cooper.)

Plaintiff and Kentfield continued to discuss the overtime requirements in a series of e-mails throughout the rest of October 2003. Kentfield again explained to Plaintiff that overtime work was necessitated by increased business demands and unforeseen staff shortages, that Kentfield hoped the need for overtime was temporary, and that Kentfield would attempt to give Plaintiff advance notice as to when he would be required to work overtime in deference to Plaintiff's childcare needs. (Def.'s 56.1 ¶ 30; E-mails between Kentfield and Johnson, 10/23/03–10/24/03, Exs. 26, 27 to Johnson Dep.) Kentfield also explained that Plaintiff could no longer ask Maria Lopez work overtime in his stead, as Plaintiff had often done in the past, because the international traffic department was also understaffed and Lopez was needed to work overtime in that department. (Def.'s 56.1 ¶ 30; E-mail from Kentfield to Johnson, 10/24/03, Ex. H-28 to Def.'s 56.1.) Plaintiff, for his part, continued to insist that he could not work overtime until 6:00 p.m. on a regular basis. (E-mail from Johnson to Kentfield, 10/31/03, Ex. H-29 to Def.'s 56.1.)

The domestic traffic department suffered another blow in December 2003, when Salonis suffered a heart attack and was forced to take medical leave. (Def.'s 56.1 ¶ 31; Kentfield Aff. ¶ 7.) Kentfield claims that during this time period, Plaintiff refused to work overtime on multiple occasions, telling Kentfield that he "had no intention to stay that day or any other day to work required overtime," and that he had "a life outside of Siemens" and was leaving. (Def.'s 56.1

---

[2]     Though Kentfield's October 23 e-mail regarding the need to work overtime was addressed to both Plaintiff and Salonis, Plaintiff claims that Kentfield made it clear that Plaintiff alone would be required to stay until 6:00 p.m. each day for overtime. (Johnson Dep., at 243.) Plaintiff also claims that Salonis was not in fact working any overtime. (*Id.*)  Neither party has submitted any overtime records for this period.

¶ 32; Kentfield Dep., at 12-14.) Plaintiff denies that he made such comments, and contends that he offered to come in as early as 2:00 a.m. in order to leave at 4:45 p.m. (Plaintiff's Response ¶ 32.) The portion of the record that Plaintiff cites, however, indicates that this offer was actually made in October 2003, when Plaintiff was first informed of the need to work overtime, and not during December 2003. (Johnson Dep., at 244-245.)[3]

In January 2004, Siemens hired Art Hurtado as traffic manager. (Def.'s 56.1 ¶ 33.) Hurtado assumed a supervisory position over the domestic and international traffic departments, and his hiring partially relieved Plaintiff's work burden. (*Id.*) Additionally, Siemens hired a temporary employee to help Plaintiff and the traffic department. (*Id.* at ¶ 34.) Even with this additional staff, management still needed Plaintiff to work mandatory overtime, (Kentfield Aff. ¶ 7), and Plaintiff did so daily during the first two weeks of January 2004. (E-mail from Kentfield to Cade, Cooper, and Hurtado, 1/20/04, Ex. H-33 to Def.'s 56.1.)

On January 19, 2004, Plaintiff met with Kentfield and Hurtado to discuss Plaintiff's concerns regarding overtime. (Def.'s 56.1 ¶ 35; Memo from Hurtado to Johnson, 10/15/04, Ex. H-6 to Def.'s 56.1; E-mail from Kentfield to Cade, Cooper, and Hurtado, 1/20/04.) Plaintiff complained at the meeting of working "unending and never ceasing 9 and 10 hour days," and claimed that he had been so busy that he failed to record all of his overtime hours. (E-mail from Kentfield to Cade, Cooper, and Hurtado, 1/20/04.) Plaintiff also stated that he would no longer work past 4:45 p.m. (Memo from Hurtado to Johnson, 10/15/04; E-mail from Kentfield to Cade, Cooper, and Hurtado, 1/20/04.) Kentfield reiterated Siemens' overtime policy and warned

---

[3]      Plaintiff makes a number of denials in his Response to Defendant's 56.1 Statement that cite portions of the record that are unrelated to the factual statement at issue, either because the denial cites to matters that occurred at a different time, cites irrelevant material, or cites to a portion of the record that is clearly contradicted elsewhere in the record. For example, Plaintiff denies that his performance rating for 2003–2004 was a "Good Minus" and instead contends that he received a "Good" rating, (Plaintiff's Response ¶ 36), despite documentary evidence to the contrary. (*See* Performance Appraisal, 2003-2004.) Where Plaintiff's factual assertions or denials are unsupported or contradicted by the record, the court ignores them.

Plaintiff that failure to perform mandatory overtime would result in disciplinary action up to and including termination. (Memo from Hurtado to Johnson, 10/15/04; E-mail from Kentfield to Cade, Cooper, and Hurtado, 1/20/04.)

Despite Kentfield's warning, Plaintiff left work at 4:45 p.m. every day except one during the week of January 19, 2004. (Memo from Hurtado to Johnson, 10/15/04.) Kentfield sent Plaintiff another e-mail on January 26, 2004, once again stressing the mandatory nature of the company's overtime policy. (Def.'s 56.1 at ¶ 38.) Plaintiff nevertheless again failed to work his mandatory overtime on January 29, which necessitated that another co-worker cover for him. (*Id.* at ¶ 39.)[4] Salonis returned from medical leave around this time, although he had to work a reduced schedule pursuant to doctor's orders. (*Id.* at ¶ 31.)

Plaintiff also met with Jim Cooper twice, once on January 22 and once on January 28, to complain about the overtime situation. (*Id.* at ¶ 40.) Cooper investigated the matter, and concluded in a January 30 e-mail message to Plaintiff that Kentfield was requiring Plaintiff to work overtime because the traffic department was understaffed and there was an increased business need, not as retaliation for Plaintiff's complaints to Human Resources about Salonis. (*Id.*; E-mail from Cooper to Johnson, 1/30/04, Ex. H-16 to Def.'s 56.1.) Cooper also noted that Plaintiff averaged only 3.5 hours per week of overtime in November and December of 2003 and worked just 14.7 hours of overtime during the first two weeks of January 2004, an amount Cooper deemed not unreasonable. (E-mail from Cooper to Johnson, 1/30/04.) Cooper stressed

---

[4] Plaintiff denies that he refused to work overtime, claiming that he had offered to pick up his daughter and bring her back to work with him so that he could perform his mandatory overtime. (Plaintiff's Response ¶ 39.) Plaintiff does not cite any portion of the record in support of this assertion, but the court is satisfied that he did make such an offer, as Kentfield responded to it by telling Plaintiff that insurance liability considerations precluded having a child in close proximity to a factory floor. (E-mail from Kentfield to Johnson, 1/29/04, Ex. 37 to Def.'s 56.1.) The record is silent as to the exact requirements necessary to qualify for the daycare subsidy. It appears from the testimony of both parties, though, that at least one of the requirements was that an applicant must regularly work less than 40 hours per week, excluding overtime.

that under company policy an employee must perform mandatory overtime when it is assigned, and that failure to perform a mandatory overtime assignment "will be regarded as failure to complete a job assignment, and may be addressed through progressive disciplinary action, up to and including termination of employment." (*Id.*)

In March 2004, Zaucha transferred into the traffic department full time as a traffic coordinator. (Def.'s 56.1 ¶ 41.) Zaucha's normal work hours were from 10:15 a.m. to 6:00 p.m. (Def.'s Supp. 56.1 ¶ 3; Kentfield Supp. Aff. ¶ 4.)[5] Zaucha worked a significant amount of overtime during her first five months in domestic traffic, and her overtime hours greatly exceeded those worked by Plaintiff. (Def.'s 56.1 ¶ 51; Kentfield Aff. ¶¶ 10, 12.) Overtime records indicate that from the middle of March 2004 until the end of August 2004, Zaucha worked more than 114 hours of overtime, whereas Plaintiff worked only 9 hours of overtime during the same time. (2004 Overtime Comparison, Ex. J-3. to Def.'s 56.1.) Kentfield and Hurtado never had to require Zaucha to perform mandatory overtime, as she almost always volunteered to work overtime. (Def.'s Supp. 56.1 ¶ 2; Hurtado Aff., Ex. L to Def.'s Supp. 56.1 ¶ 3.)

On April 28, 2004, Plaintiff, Zaucha, and Salonis met with Sam Cade and Art Hurtado to discuss work distribution within the domestic traffic department, as well as argumentative behavior and "empowerment issues" between Plaintiff and Salonis. (Def.'s 56.1 ¶ 52; Memo from Hurtado to Johnson, 10/15/04.) Zaucha herself had not engaged in any disruptive behavior. (Hurtado Dep., at 34-35.) Plaintiff contends that the meeting focused only on complaints that he and Zaucha had made to Hurtado and Cade regarding Salonis' unwillingness

---

[5]     There is some confusion in the record as to what Zaucha's regular start time was. Defendant originally claims in its 56.1 Statement that Zaucha's regular start time was 9:15 a.m. (Def.'s 56.1 ¶ 41.) Plaintiff admits to this fact in his response, (Plaintiff's Response ¶ 41), but then in his Statement of Additional Facts claims that Zaucha's start time was 3:45 p.m. (Plaintiff's 56.1 ¶ 4.) It appears from Hurtado's testimony that Zaucha began work at 3:45 p.m. when she first started in the domestic traffic department, but then shifted to a 10:15 a.m.-6:00 p.m. schedule in April 2004. (Hurtado Dep., at 21.)

to show Plaintiff and Zaucha how to perform certain tasks. (Plaintiff's Response ¶ 53; Johnson Dep., at 204-05.) Defendant does not mention whether any specific incident had generated the need for this meeting, but Defendant asserts that at this meeting, Cade explained Siemens' "zero tolerance policy," and warned Plaintiff and Salonis that any further incidents of belligerent behavior would result in termination. (Def.'s 56.1 ¶ 53; Memo from Hurtado to Johnson, 10/15/04.)

At the end of August 2004, Zaucha approached Hurtado about temporarily reducing her hours. (Def.'s 56.1 ¶ 54.) Defendant claims that Zaucha requested the reduction so that she could qualify for a state-subsidized daycare program; Zaucha, by working a regular 40 hour per week schedule, exceeded the maximum amount of hours allowed to qualify for the program. (Def.'s 56.1 ¶ 54; Kentfield Aff. ¶ 13; Cade Dep., at 27.)[6] Zaucha also told Hurtado that if she were to qualify for the subsidy and succeed in placing her child in daycare, she would need to leave work in enough time to pick her child up from the daycare, which closed at 6:15 p.m. (Zaucha Dep., Ex. B to Plaintiff's 56.1, at 15.)

Kentfield and Hurtado agreed to change Zaucha's hours to 9:15 a.m.–5:15 p.m. after they confirmed that this schedule change would not leave the department understaffed. (Def.'s 56.1 ¶ 56.)[7] Kentfield testified that before making the decision, he asked Plaintiff and Salonis if

---

[6]     Plaintiff denies this and contends that she requested the change simply due to divorce and child support, (Plaintiff's Response ¶ 54), although Plaintiff does not explain how a reduction in schedule would assist Zaucha with a divorce or child support. Plaintiff admits, however, that Zaucha learned of the subsidized program through the Plaintiff, (*Id.* at ¶ 55), and in his Statement of Additional Facts, Plaintiff himself asserts that Zaucha "desired to change her hours to qualify for a day care program." (Plaintiff's 56.1 ¶ 7.) The precise requirements for the daycare subsidy are not revealed in the record, but the parties appear to agree that at least one of the requirements was that an applicant must regularly work less than 40 hours per week, excluding overtime.

[7]     Both sides indicate that Zaucha worked only 37.5 hours per week after her schedule was changed from 9:15 a.m.–5:15 p.m., whereas she worked 40 hours per work under her original 10:15 a.m.–6:00 p.m. schedule, but neither side explains how these figures were reached.

they would be agreeable to helping Zaucha with her child care issue, and that both Plaintiff and Salonis consented to help Zaucha and cover for any additional overtime that she was unable to perform. (Kentfield Dep., at 15.) Salonis also claims that the department met as a group and agreed to help Zaucha, with Plaintiff himself volunteering to work overtime three days per week. (Salonis Dep., Ex. D to Plaintiff's 56.1, at 35-36.) Sam Cade confirms that Hurtado had told him at the time the decision was made to reduce Zaucha's regular hours that the domestic traffic department had met and volunteered to help Zaucha out. (Cade Dep., at 26.) Plaintiff contends, however, that he did not agree to work overtime, and that he protested the arrangement immediately. (Plaintiff's Response ¶ 56; Plaintiff's 56.1 ¶ 15.) Plaintiff also claims that he was told by Hurtado that the arrangement was temporary and would last only until Zaucha was approved for daycare. (Plaintiff's Response ¶ 57.) Kentfield testified that he made it clear to Zaucha that she would no longer be able to work reduced hours if the domestic traffic department became unable to meet its business needs. (Def.'s 56.1 ¶ 57; Kentfield Aff. ¶ 13.) Kentfield further testified that he had always similarly agreed to let Plaintiff leave early for personal or childcare matters provided that business needs could still be met, although Kentfield could not recall any specific occasions where he had allowed Plaintiff to leave early. (Kentfield Dep., at 14-15.) Defendant notes that Hurtado asked Zaucha to do as much overtime work as she could even after the schedule change. (Def.'s 56.1 ¶ 60; Zaucha Dep., at 29-30.)[8]

On September 29, 2004, Plaintiff, Salonis, and Zaucha met with Hurtado to discuss work distribution within the traffic department, as well as the continued friction between Plaintiff and Salonis. (Def.'s 56.1 ¶ 61; Memo from Hurtado to Johnson, 10/15/04.) Hurtado claims that

---

[8]     Plaintiff contests this, but the only evidence he cites is a portion of Zaucha's testimony in which Zaucha obviously misunderstood the question and immediately corrected herself. This misunderstanding on the part of a witness does not create a dispute of fact. Nor does it support Plaintiff's contention that Siemens does not require mandatory overtime of its employees. (Plaintiff's Response ¶¶ 16, 17; Zaucha Dep., at 28-30.)

Plaintiff and Salonis had engaged in "loud yelling" and "argumentative behavior" in the workplace. (Hurtado Dep., at 36.) According to Hurtado, Plaintiff and Salonis were not terminated at this time, even though they had been warned of the zero tolerance policy at the April 28, 2004 meeting, because Hurtado and Sam Cade were working to solve the problems between Plaintiff and Salonis. (*Id.* at 36-37.) Salonis testified that this meeting was also when obvious the traffic department discussed Zaucha's schedule change, although no final agreement was reached. (Salonis Dep., at 35-36.) Plaintiff's testimony is vague as to whether the schedule change was discussed at this meeting; he contends that Zaucha was not present at the September 29, 2004 meeting, and that he complained at that meeting that Zaucha was receiving preferential treatment because she was a white female. (Johnson Dep., at 123.) Plaintiff also claims that Zaucha was not at the meeting where Plaintiff, Salonis and Hurtado discussed Zaucha's schedule change, although he does not remember exactly when this meeting took place. (*Id.* at 87-88.) It is thus unclear whether Plaintiff is confusing the September 29, 2004 meeting with a separate meeting that he had with Hurtado and Salonis, or whether Plaintiff is asserting that the September 29, 2004 meeting was where the department discussed the schedule change and Plaintiff made his claims that Zaucha was obtaining favorable treatment.

Plaintiff and Salonis each worked overtime while Zaucha was working her reduced schedule. (Def.'s 56.1 ¶ 58.) During September and October 2004, Salonis worked 45 hours of overtime. (*Id.*) Plaintiff, in contrast, worked just 11 hours of overtime during these two months. (*Id.*)

**International Training**

Plaintiff contends that during the five years that he worked in the domestic traffic department, he requested to be trained in international shipping and claims that he was denied such training on the basis of his race. (Plaintiff's 56.1 ¶ 36.) Although he could not recall

whether there were any specific position openings in Siemens' international traffic department while he was a Siemens employee, Plaintiff felt that international training would enhance his employment prospects there, as Siemens pays international traffic coordinators more than domestic traffic coordinators, or at another employer. (Johnson Dep., at 84.)

Plaintiff asserts that he requested training from Annette McGinley in 2000, the then supervisor of the international traffic department. (Johnson Dep., at 233-234.) McGinley approved Plaintiff's request, but the training program never got off the ground, as Plaintiff became unable to attend more than one training session. (*Id.* at 234.) Plaintiff's desire to receive international training was also reflected on his 2001–2002 and 2002–2003 performance evaluations. On Plaintiff's 2001–2002 performance review, he stated as one of his written goals that "[w]ith the proper coordination with both Clifton Salonis and Robert Volk, I will schedule dates for cross training with the international department." (Performance Appraisal, 2001–2002.) Salonis' signature appears on this performance review. (*Id.*) Plaintiff wrote on his 2002–2003 performance review that while he was aware that the sudden departure of Robert Volk, the individual who was responsible for the training department, would make it more difficult for Plaintiff to receive international training, "I am determined, and I suspect there will be at some point an opportunity for me to cross-train." (Performance Appraisal, 2002–2003, Ex. N-30 to Def.'s Supp. 56.1) Indeed, Clifton Salonis testified that when he was still the supervisor of the domestic traffic department, he agreed with Plaintiff's desire to be cross-trained in international shipping and had planned for both Plaintiff and Salonis to receive this training, but was unable to follow through on this plan because Volk had left the company. (Def.'s 56.1 ¶ 23; Salonis Dep., at 25-26.) Kentfield's signature appears on Plaintiff's 2002–2003 performance review, (Performance Appraisal, 2002–2003), and Art Hurtado reviewed both of these performance reviews in February 2004. (Hurtado Dep., at 13-15.) Plaintiff also claims that during his time in the domestic traffic department he made numerous verbal requests to receive international

training from Salonis, Kentfield and Hurtado. (Johnson Dep., at 71.) Kentfield and Hurtado do not recall receiving such requests. (Kentfield Dep., at 22; Hurtado Dep., at 10-11, 19.)

Hurtado testified that, though he had received no requests for international training from any domestic traffic department employee, (Hurtado Dep., at 19; Zaucha Dep., at 40; Salonis Dep., at 21-22), he decided on his own, soon after he took over as traffic manager, that the entire domestic traffic group, which consisted of Plaintiff, Salonis, and Zaucha, should receive cross-training in international shipping. (Def.'s 56.1 ¶ 42.) Hurtado's decision was consistent with Kentfield's goal eventually to combine the domestic and international traffic departments. (Def.'s 56.1 ¶ 42.) Hurtado consulted with Kentfield regarding who should receive the training first, and they decided that Zaucha should be trained before Plaintiff and Salonis. (Def.'s 56.1 ¶ 43; Kentfield Aff. ¶ 8.) Kentfield and Hurtado claim that they decided to train Zaucha first for two reasons. First, Zaucha, whose regular hours ended at 6:00 p.m., was the only member of the domestic traffic department whose regular hours ended after 5:00 p.m., which was when the international traffic department closed. (Def.'s 56.1 ¶ 43; Kentfield Aff. ¶ 9.) Second, Kentfield and Hurtado both agreed that given Plaintiff's reluctance to work overtime, Zaucha was a better candidate to receive international training based on her ability and willingness to work additional evening hours. (Kentfield Aff. ¶ 9.) Plaintiff did nevertheless receive training with regard to Canadian exports, as part of his job responsibilities involved Canadian exports. (Def.'s 56.1 ¶ 44.) Zaucha was scheduled to receive training on October 12, 2004 through October 14, 2004, which, according to Hurtado, was the first available date for her to receive this training. (Hurtado Dep., at 28-29.) Salonis eventually received training in international shipping in 2005. (Salonis Dep., at 22.)

Defendant contends that Plaintiff did not properly request training in international shipping. (Defendant's Response to Plaintiff's Statement of Additional Material Facts (hereinafter "Def.'s Response") ¶ 36.) To request training, according to Defendant, a Siemens

employee should sign up for an in-house training course via a web portal or submit a request for any off-site training to his manager for approval. (Def.'s 56.1 ¶ 45; Cade Dep., at 25.) Kentfield testified that he has never denied an employee's request for training, and he and Hurtado both testified that they never received a request for training on international shipments from Plaintiff. (Def.'s 56.1 ¶¶ 46, 48; Def.'s Response ¶ 36; Kentfield Dep., at 22; Hurtado Dep., at 10-11, 19.) Plaintiff contends that the goals set in his written performance review constituted a request for training in international shipping, and that management thus knew of Plaintiff's desire for such training. (Plaintiff's Response ¶ 46.) Plaintiff admits that management did intend to train the entire domestic traffic department in international shipping, but claims to have been "humiliated" by management's decision to train Zaucha, a newcomer to the department who had not requested training, before Plaintiff himself was trained. (Plaintiff's Response ¶ 42; Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Plaintiff's Opposition"), at 5.)

**Plaintiff's Suspension**

On October 11, 2004, Plaintiff and Salonis were each suspended from work for three days. (Def.'s 56.1 ¶ 63.) The parties dispute the circumstances surrounding this suspension. Plaintiff claims that on September 16, 2004, he sent an e-mail to Senior Director of Productions Bob Perlowski, Kentfield's supervisor, requesting a meeting. (Plaintiff's 56.1 ¶ 14.) Perlowski came to speak with Plaintiff, and Plaintiff described to Perlowski the preferential treatment that Plaintiff felt Zaucha was receiving regarding childcare accommodations and training. (Plaintiff's 56.1 ¶ 14; Johnson Dep., at 131-132.) Plaintiff recalls that Perlowski promised to investigate the matter. (Plaintiff's 56.1 ¶ 14.) Plaintiff also recalls complaining about the preferential treatment being accorded to Zaucha at the September 29, 2004 meeting with Salonis and Hurtado. (Johnson Dep., at 123.)

Plaintiff alleges that on Friday, October 8, 2004, he learned (he does not explain how) that Zaucha would be receiving training in international shipping the following week. (Johnson Dep., at 55.) Plaintiff claims that he met with Hurtado the following Monday, October 11, accused Hurtado of giving Zaucha preferential treatment because she was a white female, and threatened to go to the EEOC with his complaints. (Plaintiff's Response ¶ 70; Plaintiff's 56.1 ¶¶ 10, 11; Johnson Dep., at 50.) Plaintiff also asserted during this meeting that Siemens was falsifying documents and income information to allow Zaucha to qualify for the subsidized daycare program. (Plaintiff's 56.1 ¶ 9; Johnson Dep., at 39-40.) According to Plaintiff, Zaucha was required to produce pay stubs to the daycare program in order to show that she earned less than the maximum amount allowed, and Siemens Human Resources staff created an inaccurate income verification form that showed that Zaucha earning less than she actually did. (Johnson Dep., at 40-41.) Plaintiff admits, however, that his suspicion that Zaucha earned too much to qualify for the daycare subsidy was based only on his own personal calculations, that he was not aware of how much Zaucha was earning after her hours were reduced at the end of August 2004, and that he simply assumed that Zaucha still earned too much to qualify for the daycare subsidy even while working her reduced schedule. (*Id.* at 41-43.) Plaintiff claims that ten minutes after his meeting with Hurtado ended, he was called back to Hurtado's office, where Hurtado and Sam Cade informed him that he was suspended for three days. (*Id.* at 53-54.) Plaintiff believes that he was suspended in response to telling Hurtado that he was going to complain to the EEOC. (Plaintiff's Response ¶ 63.)

Defendant denies that Plaintiff's suspension had anything to do with his alleged meeting with Hurtado. (Def.'s Response, ¶¶ 9-12.) Hurtado does not recall meeting with Plaintiff at all on the morning of October 11, 2004 prior to meeting with Plaintiff to inform him of his suspension, and he does not remember Plaintiff complaining that Zaucha was receiving favorable treatment or threatening to go to the EEOC. (Hurtado Dep., at 46; Hurtado Aff. ¶¶ 4, 5.) Defendant also

denies that Siemens' Human Resources Department falsified documents so that Zaucha could qualify for the daycare subsidy. (Id. at ¶ 9.) Cade testified that he was responsible for completing the portion of the form that Zaucha needed to provide to the daycare program, that he was only required to state on the form the hours that Zaucha was working, and that the information he provided was truthful and accurate. (Cade Dep., at 29-30.)

Defendant contends that Plaintiff and Salonis were suspended because of their disruptive relationship and improper workplace conduct. (Def.'s 56.1 ¶¶ 62, 63.) Hurtado recommended to Kentfield that Plaintiff and Salonis be suspended after they engaged in disrespectful, rude, and unprofessional conduct at the September 29, 2004 meeting, despite previous warnings from Hurtado and Kentfield that any further incidents would result in discipline. (Hurtado Aff. ¶ 4; Kentfield Aff. ¶ 14.) On October 8, 2004, Kentfield prepared and sent an e-mail to management and Human Resources outlining the terms of the suspension. (Def.'s 56.1 ¶¶ 62, 64; E-mail from Kentfield to Hurtado, Cade, Cooper and Perlowski, 10/08/04, Ex. J-2 to Def.'s 56.1; Kentfield Aff. ¶ 15; Hurtado Aff. ¶ 4.) The e-mail, which Plaintiff admits Kentfield sent on October 8, 2004, stated that Plaintiff and Salonis were to be suspended without pay for October 12–14, 2004, and that Plaintiff and Salonis had engaged in actions that "constituted a disruption of the workplace that Siemens cannot and will not further tolerate." (E-mail from Kentfield to Hurtado, Cade, Cooper and Perlowski, 10/08/04; Plaintiff's Response ¶ 64.) Kentfield also stated in the e-mail that it should be made "crystal clear" to Plaintiff and Salonis that there was to be an "absolute zero tolerance policy of any name-calling, finger-pointing, loud argumentative tone of voice or disrespectful language or manner towards each other or anyone else at any time on company property." (*Id.*) Kentfield further declared that "[t]he first such observed and verifiable instance of any actions contrary to our directive will result in the immediate termination of the offending employee(s)," and that this was Plaintiff's and Salonis' "last chance." (*Id.*)

On one of the three days of Plaintiff's suspension, Plaintiff called Zaucha on her cell phone and left her a message. (Zaucha Dep., at 42.) When Zaucha called him back from her home later that evening, Plaintiff told her that he had been suspended, and that he intended to file a complaint with the EEOC. (*Id.*; Plaintiff's 56.1 ¶ 65.) Zaucha recalls that Plaintiff told her that she had "better be prepared because the company was going to screw [Zaucha] by making [Zaucha] work all the over-time," and that Plaintiff was not going to work any more overtime. (Def.'s 56.1 ¶ 65; Statement of Joanna Zaucha, Ex. I-9 to Def.'s 56.1.) Plaintiff denies making these statements. (Plaintiff's 56.1 ¶ 65.)

**Post Suspension**

Plaintiff returned to work on October 15, 2004. (*Id.* at ¶ 19.) On October 18, 2004, Hurtado gave Plaintiff a disciplinary notice dated October 15, 2004 that listed the incidents that led to Plaintiff's suspension. (Plaintiff's 56.1 ¶ 20; Memo from Hurtado to Johnson, 10/15/04.) The disciplinary notice referenced the following incidents: (1) the January 19, 2004 meeting between Plaintiff, Hurtado, and Kentfield where Plaintiff disregarded Kentfield's warnings that failure to work mandatory overtime would be addressed through disciplinary action up to and including termination; (2) the April 28, 2004 meeting where Plaintiff, Salonis, and Zaucha met with Hurtado and Cade, at which time Cade purportedly explained Siemens' "zero tolerance policy" and emphasized that continued belligerent actions would result in termination; (3) the September 29, 2004 meeting where Plaintiff, Salonis, and Zaucha met with Hurtado to discuss work distribution and the friction between Plaintiff and Salonis, and where Plaintiff allegedly engaged in unprofessional and disrespectful behavior; and (4) the continued disruptive behavior and arguments between Plaintiff and Salonis between September 29, 2004 and October 1, 2004. (Memo from Hurtado to Johnson, 10/15/04.) Hurtado warned Plaintiff in the disciplinary notice that "any further incidences of this nature and/or failure to follow these guidelines will result in immediate termination of employment." (*Id.*)

Plaintiff believes that the incidents mentioned in the disciplinary notice were not the real reason for his discharge. First, as noted, he claims that he had a conversation with Hurtado in which he complained that Zaucha was receiving favorable treatment, accused Siemens of defrauding the State of Illinois by falsifying Zaucha's income verification forms, and threatened to go to the EEOC, just ten minutes before Plaintiff was informed of his suspension. (Johnson Dep., at 53-54.) Second, Plaintiff contends that Siemens did not follow the proper suspension process, as Plaintiff did not receive any written warnings for the incidents mentioned in the disciplinary notice, nor did he receive a verbal warning of suspension. (*Id.* at 51, 53.) Defendant admits that Plaintiff did not receive a written warning regarding the issues raised in January 29, 2004 and September 29, 2004 meetings prior to the October 18, 2004 disciplinary notice, (Def.'s Response ¶¶ 21, 23), and that this disciplinary notice was Plaintiff's first written notice of 2004. (Id. at ¶ 24.) Defendant denies that Plaintiff did not receive a disciplinary warning concerning the issues raised in the April 28, 2004 meeting prior to October 18, 2004, but does not specify whether any such disciplinary warning was in writing. (*Id.* at 22.) Third, Plaintiff contends that he and Salonis had not engaged in any significant arguments in the weeks leading up to the suspension. (Johnson Dep., at 53.) Finally, Plaintiff claims that five minutes before he went to complain to Hurtado on the morning of October 11, Plaintiff received an e-mail from Hurtado telling Plaintiff that an important piece of freight was coming within the next three days and that Plaintiff needed to watch out for the freight and take care of it when it arrived. (*Id.* at 54.) Plaintiff argues that this e-mail establishes that there was no intention to suspend Plaintiff before he complained to Hurtado. (*Id.*) Plaintiff has not, however, produced a copy of this alleged e-mail.

On the same day that Hurtado gave Plaintiff the disciplinary notice regarding his suspension, Plaintiff sent Hurtado an e-mail in which he stated "I can not continue to stay past my official end time of 4:45 p.m. [because] I need to pick up my 4 year old from her daycare as

well as other family obligations." (Def.'s 56.1 ¶ 68; E-mail from Johnson to Hurtado, 10/18/04, Ex. H-4 to Def.'s 56.1.) After receiving Plaintiff's e-mail, Hurtado sent Zaucha a memo on October 20, 2004 telling her that, effective November 1, 2004, she would be required to return to her normally scheduled work hours. (Def.'s 56.1 ¶ 71; Memo from Hurtado to Zaucha, 10/20/04, Ex. I-8 to Def.'s 56.1.) The memo explained, "[w]e understand your daycare situation is conflicting with your scheduled work hours of 9:15 a.m. to 6 p.m. While we sympathize with your situation, we also feel that we must remain consistent with the company's policy in the Traffic Department." (Memo from Hurtado to Zaucha, 10/20/04.) Zaucha was warned that "[f]ailure to work as required until 6 p.m. would be addressed through disciplinary action, up to and including termination of employment." (*Id.*) Also on October 20, 2004, Plaintiff formally filed a complaint with the EEOC alleging race and gender discrimination and retaliation. (Def.'s 56.1 ¶ 69; Complaint of Employment Discrimination, Ex. H-2 to Def.'s 56.1, at 2-4.)

The next morning, Plaintiff sent Cade an e-mail requesting a meeting. (Def.'s 56.1 ¶ 70; E-mail from Johnson to Cade, 10/21/04, Ex. H-36 to Def.'s 56.1.) Cade and Plaintiff both agree that a meeting did take place, although neither can recall the exact date of the meeting. (Cade Dep., at 20, 22; Johnson Dep., at 64.) Plaintiff contends that he told Cade at this meeting that he felt that he had been suspended because he complained that Zaucha was receiving preferential treatment and threatened to go to the EEOC. According to Plaintiff, Cade agreed and warned Plaintiff that "[t]hey're trying to fire you, and you should go and find another job because they're trying to fire you." (Plaintiff's 56.1 ¶ 27; Johnson Dep., at 65-66.) Cade denies having made such statements. (Def.'s Response ¶ 27; Cade Dep., at 31.) He recalls that Plaintiff's only complaint at this meeting was that Zaucha had received training that Plaintiff had not, and that Plaintiff wanted closure on the matter because "he would not want to have to go to the EEOC." (Def.'s Response ¶ 27; Cade Dep., at 21-22.)

Somewhere between the time Plaintiff and Salonis returned from their suspensions and November 10, 2004, Salonis was involved in an argument with a truck driver. (Plaintiff's 56.1 ¶ 26; Hurtado Dep., at 71.) Both Plaintiff and Salonis reported the argument to Hurtado. (Plaintiff's 56.1 ¶ 26.) Plaintiff testified that this driver worked for one of the accounts for which Plaintiff was responsible, and that ordinarily Plaintiff would have told Salonis to "stand down" and let Plaintiff handle any problems involving the driver, but because he did not want to appear as though he were arguing with Salonis he chose instead to report the matter to Hurtado. (Johnson Dep., at 165.) Plaintiff considered Salonis' behavior to be an "extreme violation" of the terms of the suspension, but when Hurtado investigated the matter, the truck driver told Hurtado that he was not bothered or upset by Salonis' behavior. (*Id.*; Hurtado Aff. ¶ 6.) Hurtado decided that because he had not personally witnessed the incident and the truck driver was not upset, Salonis should not be disciplined. (*Id.*)

**Incident between Plaintiff and Zaucha**

On November 10, 2004, Plaintiff and Zaucha were involved in an incident which Zaucha complained about later that day to Cade and Jim Cooper. (Def.'s 56.1 ¶¶ 73, 74; Plaintiff's 56.1 ¶ 28.) The facts are disputed. Plaintiff claims that Zaucha was having difficulties understanding some paperwork and asked Plaintiff for help. (Plaintiff's 56.1 ¶ 28; Johnson Dep., at 272.) Plaintiff went out to look at the shipments at issue, and then returned to the office and began explaining to Zaucha how to recognize different types of shipments. (Johnson Dep., at 272.) In the middle of this conversation, Plaintiff stopped to take a phone call. (Plaintiff's 56.1 ¶ 28; Johnson Dep., at 272.) Zaucha became angry about the interruption, and ignored Plaintiff when he finished the phone call and tried to resume the conversation. (Plaintiff's 56.1 ¶ 28; Johnson Dep., at 272.) Plaintiff attempted to get Zaucha's attention by brushing the paperwork against her arm and by placing the paperwork in front of her. (Plaintiff's 56.1 ¶ 28; Johnson Dep., at 272-273.) When Zaucha still refused to respond, Plaintiff said words to the effect of "I explained

to you what you need to do," and ended the conversation. (Johnson Dep., at 273.) Plaintiff then immediately reported the incident to Rigoberto Sixto, whose office shared a common wall with Plaintiff's office. (*Id.* at 307; Sixto Dep., at 24.) Sixto testified that he believes that he was in his office at the time of the incident, and that he did not hear any yelling or arguments between Plaintiff and Zaucha. (Sixto Dep., at 24-25.)

Zaucha disputes Plaintiff's version of the incident. According to her deposition testimony, on the afternoon of November 10, 2004, as she was finishing up some work in the office while Plaintiff and Salonis were at lunch, Zaucha came across several shipments that she did not know how to process. (Zaucha Dep., at 35.) Zaucha left these shipments and went out to lunch. (*Id.*)  By the time she returned, Plaintiff and Salonis were also back in the office, though Salonis was not present for the conversation she had with Plaintiff, in which she asked him about the shipments that she was having trouble with.   Plaintiff asked Zaucha if she had checked the documents on the shipments, and she told him that she had not done so. (*Id.* at 35-36.) Plaintiff then left the office, came back inside, stood beside Zaucha, and twice loudly directed her, "hey, look at me."  (*Id.* at 36.) Zaucha asked Plaintiff not to speak to her that way, but Plaintiff rolled the paper that he had in his hand, tapped Zaucha on the shoulder with it, shook the paper in Zaucha's face and told Zaucha that this was "part of [her] job, [she] should learn how to do it." (*Id.*)

After the incident, Zaucha called and e-mailed Cade, asking to speak with him. (Zaucha Dep., at 39; Cade Dep., at 37-38.) Cade testified that Zaucha came in to meet with him, upset and crying, and told Cade that she had been involved in "an altercation" with Plaintiff. (Cade Dep., at 38.) Zaucha reported that Plaintiff had raised his voice at her, held a rolled-up piece of paper close to her face, and tapped her on the shoulder with the paper. (*Id.* at 39.) Zaucha also claimed that Plaintiff yelled at her and called her "an evil woman." (*Id.*) Cade made notes of the conversation with Zaucha, and later used these notes to prepare a statement for Zaucha to

sign. (*Id.*; Def.'s Response ¶ 33.) Cade then called his boss, Cooper. (Cade Dep., at 41.) Zaucha reported her story to him, visibly shaken and fearful. (*Id.* at 42-43; Cooper Dep., Ex. G to Def.'s 56.1, at 27, 29.)

Cade also spoke with Hurtado, who investigated the incident that same day by speaking with the parties involved. (Hurtado Dep., at 59-60; Johnson Dep., at 269.) Hurtado first interviewed Zaucha, who gave Hurtado her version of the incident and told him that she felt "threatened" and "scared" by Plaintiff's "abusive" behavior. (Hurtado Dep., at 58.) Hurtado then met with Plaintiff, whose account of the incident was generally consistent with Zaucha's; according to Hurtado, Plaintiff admitted to tapping Zaucha on the shoulder with the papers to get her attention. (*Id.* at 59.) Plaintiff contends that Hurtado told him at this meeting that Zaucha's only complaint was that Plaintiff had not helped her with a project, and that there was no mention of Plaintiff having been intimidating or having hit Zaucha. (Johnson Dep., at 269, 271.) Plaintiff told Hurtado that he had in fact helped Zaucha with the project, had told her exactly what she needed to do, and had even verified with Mark Marcus of Siemens' procurement department, that the instructions he had given her were accurate. (*Id.* at 269-270.) Hurtado then spoke with Marcus, who confirmed that Plaintiff had in fact consulted with him. (*Id.* at 270; Hurtado Dep., at 60.) Hurtado reported his findings individually to Cade and Kentfield. (Hurtado Dep., at 60-61.) When Hurtado consulted with Kentfield, Kentfield told him that "this was not to be tolerated," and "we have to take the next steps to either terminate him or whatever is recommended through HR." (*Id.* at 61.)

Soon after Plaintiff was interviewed by Hurtado, Plaintiff met with Cade and Cooper to discuss the incident. (Johnson Dep., at 270-271; Cooper Dep., at 30; Cade Dep., at 44.) At this meeting, Plaintiff claims that he was accused of intimidating Zaucha and hitting her with a piece of paper. (Johnson Dep., at 271.) Plaintiff told Cade and Cooper that Zaucha was lying because she was upset about having to return to her regular hours, and described his version of the

incident for them. (*Id.*) Cooper recalls that Plaintiff's version of the incident was very "tame" and "low key," and both Cooper and Cade claim that Plaintiff at this point denied touching Zaucha with the papers. (Cooper Dep., at 30-31; Cade Dep., at 44.) As evidence that he and Zaucha were on friendly terms, Plaintiff showed Cade and Cooper an e-mail that Zaucha had sent Plaintiff several days before his suspension. (Johnson Dep., at 278-279.) The e-mail, which Zaucha had titled "Joanna at Work," contained a Victoria Secret advertisement in which a woman was dressed in a very provocative business suit. (*Id.* at 279; Zaucha Dep., at 51.) Cade and Cooper reviewed a copy of Plaintiff's disciplinary notice from his recent suspension, informed him that they believed Zaucha's version of the incident, and directed that he return to work. (*Id.* at 272-273) Cade and Cooper then presented their findings to Bob Perlowski. (Cade Dep., at 45.) Plaintiff maintains that after he met with Cade and Cooper, he asked Hurtado, Cade and Cooper to interview Sixto, but they ignored Plaintiff's request. (*Id.* at 308-310; Plaintiff's 56.1 ¶ 31.) Sixto never was interviewed about the incident. (Sixto Dep., at 25.)

**Plaintiff's Termination**

After Hurtado, Cade, and Cooper concluded their investigations of the November 10, 2004 incident, Siemens management reviewed the results of these investigations. (Def.'s 56.1 ¶ 77; Cooper Dep., at 35.) Management also reviewed Plaintiff's disciplinary record, including Plaintiff's recent suspension, Plaintiff's disruptive arguments with Salonis, Plaintiff's 1999 suspension for fighting in the warehouse and Plaintiff's 2002 incident with a cafeteria worker. (Cooper Dep., at 35-36.) After examining both the findings of the November 10, 2004 investigations and Plaintiff's disciplinary record, Perlowski, Kentfield and Cooper made the decision to terminate Plaintiff for "repeated acts of disrespectful, disruptive and threatening behavior in the workplace." (Def.'s 56.1 ¶ 78; Def.'s Supp. 56.1 ¶ 12; Cooper Dep., at 35.) Siemens officially terminated Plaintiff's employment on November 15, 2004. (Johnson Dep., at 45, 274.)

**DISCUSSION**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case in order for the motion to prevail. *Celotex Corp.*, 477 U.S. at 322-323. If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in his favor, summary judgment should be granted. *Id.*

**A.      Race and Gender Discrimination**

Plaintiff contends that Defendant discriminated against him on the basis of his race in rejecting his requests for international training and on the basis of his race and gender in rejecting his request for work hours to accommodate his childcare schedule in violation of Title VII and 42 U.S.C. § 1981. A plaintiff may prove discrimination under Title VII or 42 U.S.C. § 1981 through either the direct or indirect method. *Sun v. Bd. of Tr. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 820 (7th Cir. 2006). Under the direct method, the plaintiff must present either direct or circumstantial evidence of discrimination. *Sun,* 473 F.3d at 812. Under the indirect method, the plaintiff must first establish

a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Keri v. Bd. of Tr. of Purdue Univ.*, 458 F.3d 620, 643 (7th Cir. 2006). If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the alleged discriminatory actions. *Keri*, 458 F.3d at 643. If the defendant meets this burden, the plaintiff must then establish that the defendant's reasons are actually a pretext for discrimination. *Id.* Plaintiff here relies on the indirect method to show that Defendant improperly discriminated against him. (Plaintiff's Opposition, at 3.)[9]

Defendant focuses the majority of its argument on Plaintiff's alleged failure to satisfy the last two prongs of the indirect method. Specifically, Defendant contends that neither the denial of training nor the denial of childcare accommodations constituted an adverse employment action, and that Plaintiff and Zaucha were not similarly situated employees. For the purposes of this motion, the court assumes that Plaintiff and Zaucha were similarly situated employees, but concludes that Plaintiff has not presented sufficient evidence to show that he suffered an adverse employment action. In addition, Plaintiff has no evidence that the reasons that Defendant offers for its actions are pretextual.

### 1.      Adverse Employment Action

An adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or disruption of

---

[9]      Plaintiff alleges that the denials of training and childcare accommodations are a violation of both Title VII and 42 U.S.C. § 1981. While Title VII and 42 U.S.C. § 1981 "differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Ft. Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996); *See also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007). Therefore, the following analysis applies to Plaintiff's race discrimination claims under Title VII and 42 U.S.C. § 1981.

job responsibilities." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Tr. Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Adverse employment actions generally involve economic injuries, such as termination, suspension, failure to promote or diminution in salary. *Markel v. Board of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). The action does not necessarily have to cause Plaintiff a present economic harm, as even an act that could cause an employee to suffer a future economic loss can be considered an adverse employment action. *Herrnreiter v. Chicago Housing Auth.*, 315 F.2d 742, 744 (7th Cir. 2002) (noting that an employee can suffer an adverse employment action even where the act in question causes him future, as opposed to present, economic harm, such as where the employee is transferred to a lateral position that significantly reduces his career prospects by preventing him from using the skills in which he is trained or where the employee's job is changed in a way that harms his career). Employment actions that cause non-economic injuries can also be considered adverse, such as where an employer significantly diminishes an employee's material responsibility, causes an employee to suffer a material loss of benefits or bestows upon an employee a less distinguished title. *Stockett*, 221 F.3d at 1001; *Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 612-613 (7th Cir. 2001). Employment actions that are designed to humiliate an employee or subject him to degrading, unsafe or otherwise negative workplace conditions can be considered adverse employment actions as well. *Stockett*, 221 F.3d at 1001; *Herrnreiter*, 315 F.2d at 744. Still, while "adverse employment action" has been defined "quite broadly," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), "not everything that makes an employee unhappy is an actionable adverse action." *Id.* Otherwise, even "one dirty look would be enough to trigger liability under Title VII." *Herrnreiter*, 315 F.2d at 744. Rather, the act in question must be one that "materially alters the terms and conditions of employment" in order to qualify as an adverse employment action. *Stutler v. Ill. Dep't. of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001).

An employee who is denied training that is integral to his job could be considered to have suffered an adverse employment action. *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) ("A discriminatory denial of job-related training can constitute an adverse employment action under Title VII."); *cf. Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (finding that a machine operator had not been denied training that was necessary for him to properly operate his equipment, and thus did not suffer an adverse employment action). However, Plaintiff has not presented evidence that training in international shipping was necessary for him to properly perform his job, or that failure to receive such training impaired his ability to work as a domestic traffic coordinator in any way. Plaintiff worked in the domestic traffic department, where his responsibilities were limited to shipments within the United States and Canada. Plaintiff received necessary training in Canadian shipping to help him perform his job functions regarding Canadian exports. International shipments, though, fell outside the scope of Plaintiff's responsibilities as a domestic traffic coordinator. Plaintiff suggests that because Kentfield and Hurtado intended to eventually combine the domestic and international traffic departments, his failure to receive international training significantly diminished his material responsibilities within the domestic traffic department itself. (Plaintiff's Opposition, at 4.) While Plaintiff's argument suggests that at some future point, after the merger of the domestic and international traffic departments, international training might become necessary for traffic coordinators to properly perform their jobs, there is no evidence that he was unable to perform as a domestic traffic coordinator without receiving international training.

Plaintiff has also failed to show that a lack of international training jeopardized his chances for any promotions, favorable transfers, or advantageous increases in responsibility. *See Herrnreiter*, 315 F.2d at 744 (holding that actions that reduce or stunt an employee's career prospects could be considered adverse employment actions); *cf. Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (finding that "[a]bsent some tangible job consequences accompanying

[performance reprimands], we decline to extend the definition of adverse employment action to include them."); *Oest*, 240 F.2d at 611 (finding that a corrections officer who received negative performance evaluations did not suffer an adverse employment action because she could not show that the reprimands led to immediate consequences such as ineligibility for promotion, transfer to a favorable location or beneficial increases in responsibility). Plaintiff speculates that training in international shipping would have increased his chances of transferring into the international traffic department, which Plaintiff considered to be a promotion, or his chances of obtaining a similar position with a different company.  Such mere speculation that an action might harm his chances for promotion or career advancement is not enough to establish the act as an adverse employment action. *See, e.g., O'Neal v. City of Chicago*, 392 F.2d 909, 912 (7th Cir. 2004) (finding that a police officer who had offered only speculation that a transfer within the police department had harmed her chances for promotion did not suffer an adverse employment action).

Plaintiff cites *Stockett*, where the court recognized that conditions of employment that are "designed to harass and humiliate employee because of their race are actionable adverse employment actions under Title VII." 221 F.3d at 1001.  He contends, without citing any evidence in the record, that he was humiliated by Kentfield's and Hurtado's decision that Zaucha would receive international training first.  In the court's view, *Stockett* is more relevant to the issue of establishing pretext, not adverse employment action.  In *Stockett*, the court affirmed summary judgment in favor of an employer who required an employee to submit to a drug test in response to an anonymous report that the employee had been seen using drugs and an experienced professional's observation of physical signs of drug use on the employee's part. The court held that the drug test constituted a "reasonable and legitimate request" in light of the circumstances.  *Id.* at 1002. While Plaintiff is correct, therefore, that acts that are designed to humiliate employees can constitute adverse employment actions, "reasonable and legitimate"

acts, such as the mandatory drug test in *Stockett*, are not adverse employment actions. In this case, Zaucha was the only member of the domestic traffic department whose regular hours ended after the international traffic department closed, and, unlike Plaintiff, she had shown a willingness to work additional evening hours. Similar to the mandatory drug test in *Stockett*, the decision to train Zaucha in international shipping before Plaintiff was the type of reasonable and legitimate act that does not constitute an adverse employment action.

## 2. Pretext

Even assuming that Defendant did subject Plaintiff to adverse employment actions, Plaintiff's Title VII and 42 U.S.C. § 1981 claims still fail because he cannot show that the reasons offered by the Defendant for its actions are pretextual. In determining whether an employer's stated reasons for its actions are pretextual, a court should look only to whether the employer has provided the honest reasons for its actions, not whether the employer's reasons were unwise or incorrect. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the actions of which the plaintiff complains is correct, but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered."). "A pretext . . . is a deliberate falsehood." *Forrester*, 453 F.3d at 419. Conversely, an honest mistake is not considered to be a pretext, and an employer's mistaken belief that its conduct was warranted is not unlawful, so long as the belief was honestly held. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006); *Forrester*, 453 F.3d at 419 ("An honest mistake, however dumb, is not [a pretext], and if there is no doubt that this is the real reason, it blocks the case at the summary judgment stage."). "[The courts] do not sit as a superpersonnel department that reexamines an entity's business decisions and

33

reviews the propriety of the decision." *Stewart*, 207 F.3d at 378. Rather, the only concern is "whether the legitimate reason provided by the employer is in fact the true one." *Id.*

Plaintiff has not brought any evidence at all that Defendant's proffered reasons for training Zaucha in international shipping before Plaintiff are lies or "deliberate falsehoods." As noted earlier, Defendant has provided several legitimate justifications for Kentfield's and Hurtado's decision to provide Zaucha with international training first. Zaucha's regular hours were from 9:15 a.m. until 6:00 p.m. She was the only member of the domestic traffic department whose regular hours ended after the international traffic department closed at 5 p.m., and she was responsible for any international shipments that arrived after the international traffic department closed for the day. It was therefore imperative that Zaucha receive international training so that she could properly handle these international shipments.[10] Further, Zaucha, as opposed to Plaintiff, had shown a desire to work overtime and extra evening hours. There is no evidence that Kentfield and Hurtado did not honestly believe their own proffered reasons for the decision to train Zaucha before Plaintiff, or that Zaucha was the best candidate to receive international training first. The mere fact that Kentfield and Hurtado chose to provide a white employee with training before Plaintiff is not enough to establish pretext either. *Cf. Grube*, 257 F.3d at 730 (finding that a female employee who had been transferred to fill one open spot on a different shift could not establish that her employer's proffered reasons for the transfer were pretextual merely by arguing that her employer chose to transfer her to fill the open spot, as opposed to one of her two male co-workers).

---

[10] Plaintiff appears to deny that Defendant provided Zaucha with international training first because her regular hours ended at 6:00 p.m. by arguing that Zaucha's regular hours ended at 5:15 p.m. during her two-month schedule change in September and October 2004. (Plaintiff's Response ¶ 43.) Aside from the fact that Plaintiff does not explain how this indicates that Defendant has not provided its honest reason for training Zaucha first, Plaintiff ignores his own admissions that the decision to train Zaucha was made in February or March 2004, well before Zaucha ever requested a schedule change, and that Zaucha's schedule change was in any event only temporary. (Plaintiff's Response ¶¶ 42, 57.)

The court will assume, for purposes of this discussion, that Defendant's failure to accommodate Plaintiff's child care schedule was an adverse employment action.[11] Plaintiff has failed to establish that Defendant's stated reasons for this action were pretextual. Defendant claims that it needed Plaintiff to work mandatory overtime in late 2003 and early 2004 because the department was understaffed and was having difficulties meeting its business requirements. Plaintiff himself admits that the department was understaffed and unable to meet its business needs during this period, even with Zaucha assisting part time. Plaintiff was informed of these reasons at the time by Kentfield. Furthermore, Jim Cooper independently confirmed that these were the reasons why Plaintiff was being asked to work overtime after conducting an investigation into the matter at Plaintiff's request. Plaintiff has not brought any evidence that either Kentfield or Cooper did not honestly believe that Plaintiff was needed to work overtime due to understaffing and increased business needs.

Plaintiff contends that Defendant's reasons are pretextual because Zaucha was told that she did not have to work mandatory overtime, whereas Plaintiff was told that he must work mandatory overtime out of business necessity, and because Plaintiff was rebuffed when he offered to come in early to work—an indication, according to Plaintiff, that Defendant was only interested in imposing on him, rather than meeting the business needs of the department. As noted earlier, however, Plaintiff's contention that Zaucha was not required to work mandatory overtime is based on a misstatement by Zaucha during her deposition testimony, which she later clarified. Additionally, if Zaucha's overtime was not categorized as "mandatory," it is only

_____

[11] It should be noted, though, that despite Plaintiff's complaints about the detrimental impact that the mandatory overtime requirement caused him, the record indicates that Plaintiff actually performed very little overtime, particularly in comparison to his co-workers. Plaintiff only averaged 3.5 hours of overtime per week during November and December 2003. Between March 2004 and August 2004, Plaintiff worked only nine total hours of overtime, whereas Zaucha performed 114 hours of overtime. Even during the two months of Zaucha's schedule change, when Plaintiff and Salonis were left to fill the domestic traffic department's overtime requirements, Plaintiff performed only 11 hours of overtime, while Salonis worked 45 hours of overtime.

because she, unlike Plaintiff, never declined to work voluntary overtime. Indeed, a comparison of the amount of overtime performed by Plaintiff and Zaucha from the time Zaucha joined the domestic traffic department full time shows that Plaintiff's overtime hours pale in comparison Zaucha's.

Plaintiff also improperly compares two different time periods. Plaintiff was asked to work mandatory overtime in late 2003 and early 2004. The domestic traffic department was understaffed due to Maria Lopez's transfer and Salonis' illness, and could not meet its business needs without having Plaintiff work overtime. In contrast, when Zaucha requested her schedule change in August 2004, the department was fully staffed: Hurtado had been hired as traffic manager, Salonis was several months removed from his sick leave, and Zaucha had been hired as an additional traffic coordinator. Kentfield and Hurtado claim that they granted Zaucha's request for a schedule reduction after determining that the domestic traffic department would still be able to satisfy its business requirements even if Zaucha worked a reduced schedule. Again, Plaintiff has not presented any evidence that Kentfield and Hurtado did not honestly believe their justification for granting Zaucha's request.

Plaintiff sees evidence of pretext in Defendant's apparent failure to accept his offer to come to work early. Defendant's failure to respond to this argument more directly[12] is disappointing, but the court concludes it does not establish pretext. The court notes that in Plaintiff's Response he claims that that he made this offer in December 2003, whereas in his deposition testimony he indicates that he made the offer in October 2003. In any event, Plaintiff has not presented any evidence that the domestic traffic department could complete its daily shipment tasks as effectively if Plaintiff came in early as if he worked late. Plaintiff's desire to

---

[12]    Defendant argues that this purported offer merely shows that Plaintiff requested an alternative schedule, not that Plaintiff did not refuse to work overtime. (Memorandum in Support of Motion to Strike Certain Responses to Defendant's 56.1 Statement, at 6.)

limit his overtime hours is understandable, but the question before this court is not whether Siemens made an appropriate business decision, but whether Siemens discriminated against Plaintiff by denying his request. In the context of the Americans with Disabilities Act, where accommodation is a statutory requirement, the courts have explained that an employer "is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *See, e.g., EEOC v. Yellow Freight System, Inc.,* 253 F.3d 943, 951 (7th Cir. 2001).

Assuming the requirement of reasonable accommodation applies similarly here, the court concludes Siemens met it. Out of deference to Plaintiff's childcare needs, Kentfield attempted to give Plaintiff advance notice as to when Plaintiff would be required to work overtime so that he could make arrangements to have someone else pick up his daughter from daycare. Kentfield remained patient with Plaintiff's persistent failure to work overtime in late 2003 and early 2004, even though the department needed Plaintiff to work overtime during that period. Plaintiff admits that Defendant hired both Hurtado and a temporary employee to help lessen Plaintiff's work burden in the domestic traffic department. Defendant also transferred Zaucha into the department full time, further lessening Plaintiff's burden. In fact, from the time Zaucha transferred into the department in March 2004 until her schedule change in late August 2004, Plaintiff only needed to work a scant 9 hours of overtime in comparison. Even during Zaucha's two month schedule change, Plaintiff was only required to work 11 hours of overtime, whereas Salonis worked 45 hours of overtime. And when Plaintiff formally complained of having to work overtime because of Zaucha's schedule change and the detrimental effect it was having on his ability to pick up his daughter from daycare, Hurtado immediately required Zaucha to return to her normal work hours. Defendant's efforts to accommodate Plaintiff went well beyond the temporary schedule reduction granted to Zaucha. Far from establishing pretext, a

comparison between Defendant's treatment of Plaintiff and Zaucha demonstrates that, if anything, Defendant made substantial effort to accommodate Plaintiff's needs.

**B.      Retaliation**

Plaintiff next contends that Defendant improperly retaliated against him in violation of Title VII by suspending and later terminating him for complaining to Siemens management about race and gender discrimination and for filing a complaint with the EEOC. A plaintiff can establish retaliation under either the direct or indirect method. Under the direct method, the plaintiff must show: (1) that he engaged in a statutorily protected activity; (2) that his employer subjected him to an adverse employment action; and (3) that there is a causal connection between the two events. *Humphries*, 474 F.3d at 404; *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). A plaintiff can satisfy the direct method by bringing either direct or circumstantial evidence that he engaged in protected activity and, as a result, suffered an adverse employment action. *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902-903 (7th Cir. 2006). Under the indirect method, the plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than other, similarly situated employees who did not engage in protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 657, 663 (7th Cir. 2006). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the employer meets this burden, the burden then shifts back to the employee to show that the employer's proffered reasons for its actions are pretextual. *Id.* Plaintiff's attempts to use both the direct and indirect method to prove his retaliation claim.

### 1.    Direct Method

Plaintiff argues that he has established the three prongs of the direct method: (1) Plaintiff engaged in protected activity by complaining of race and gender discrimination to Bob Perlowski on September 16, 2004 and to Hurtado on October 11, 2004; (2) Plaintiff suffered the adverse employment actions of suspension and termination; and (3) Plaintiff testified that the suspension and termination directly followed his protected activity. (Plaintiff's Response, at 7.) Plaintiff has certainly satisfied the second prong, as suspension and termination are both adverse employment actions. *See, e.g., Markel*, 276 F.3d at 911.  He testified that he complained of race and gender discrimination to Perlowski and Hurtado prior to his suspension and it is undisputed that he filed a formal complaint with the EEOC for the suspension.

The court concludes, however, that the evidence does not support the conclusion that his complaints were the reason for his suspension and termination.  Plaintiff's only evidence in support of a causal connection is his own testimony that his suspension and termination followed closely after his complaints.  "Suspicious timing alone rarely is sufficient to create a triable issue," however.  *Tomanovich*, 457 F.3d at 665 (quoting *Moser v. Ind. Dept. of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005)); *See also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("[M]ere temporal proximity is not enough to establish a genuine issue of material fact.") (internal quotation marks and citation omitted); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). The close proximity of Plaintiff's complaints to his suspension and termination is therefore, standing alone, not enough to establish a causal connection.

More importantly, with respect to the suspension, the record defeats any inference of a causal connection. Plaintiff admits that Kentfield sent an e-mail to Siemens management and Human Resources on October 8, 2004, in which he stated that Plaintiff and Salonis were to be suspended without pay for October 12–14, 2004. This e-mail was sent three days prior to Plaintiff's alleged complaints to Hurtado on October 11. It thus appears quite clear that the decision to suspend Plaintiff was made before, and not in response to, Plaintiff's alleged complaints to Hurtado.

### 2. Indirect Method

Plaintiff also argues that he has indirect evidence of retaliation: (1) Plaintiff engaged in protected activity by complaining of race and gender discrimination to Bob Perlowski on September 16, 2004 and to Hurtado on October 11, 2004; (2) Plaintiff was meeting Defendant's legitimate business expectations; (3) Plaintiff suffered the adverse employment actions of suspension and termination; and (4) Salonis, a similarly situated employee, was not terminated post suspension after he was involved in a dispute with a truck driver, yet Plaintiff was terminated after his incident with Zaucha. Plaintiff did suffer an adverse employment action, and the court will assume, as above, that Plaintiff engaged in protected behavior and that he was meeting Defendant's legitimate business expectations. The court will also assume that Plaintiff and Salonis were similarly situated employees.[13]   Plaintiff's retaliation claim nevertheless fails

---

[13]   The court notes, though, that Plaintiff and Salonis had different disciplinary histories, and generally, "[i]n order to show that a coworker was similarly situated to a terminated employee, the other employee must show that the coworker had a comparable set of failings." *Burks v. Wisc. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks and citation omitted). Plaintiff had a lengthy disciplinary record at Siemens, including a warehouse brawl that resulted in a five-day suspension, an outburst at a cafeteria worker that was witnessed by Siemens employees and supervisors, numerous refusals to perform mandatory overtime and general difficulties with his coworkers. In contrast, Salonis, prior to his suspension in October 2004, had only one formal disciplinary incident, a 2002 warning for being verbally abusive towards his co-workers. Although there was long-standing difficulty between Plaintiff himself and Salonis, there is no evidence that

(continued...)

because he does not meet his burden of showing that Defendant's proffered legitimate reasons for suspending and terminating him were pretextual.

Defendant contends that Plaintiff and Salonis were suspended because of their disruptive relationship and improper workplace conduct. Plaintiff has not offered any evidence that these were not the true reasons for his suspension. Moreover, the record strongly supports Defendant's contentions. Kentfield's October 8, 2004 e-mail outlining the terms of Plaintiff's suspension stated that he and Salonis were being suspended for disruptive workplace conduct. As Kentfield sent this e-mail three days before Plaintiff's complaints to Hurtado, it is reasonable to conclude that the stated reasons in the e-mail were the true grounds for Plaintiff's suspension, and not Plaintiff's later complaints to Hurtado.

Plaintiff similarly does not offer any evidence that Defendant's stated reasons for terminating Plaintiff after his incident with Zaucha but retaining Salonis after his dispute with the truck driver were pretextual. Both matters were investigated fully by Siemens management, and they determined that the incidents warranted different actions. In the case of Salonis' dispute with the truck driver, Hurtado spoke with all parties involved, including the truck driver, who told Hurtado that he was not at all bothered by the dispute, and determined that Salonis did not deserve disciplinary action. Siemens management similarly investigated Plaintiff's incident with Zaucha. Hurtado spoke with the parties involved, including Plaintiff, and Cade and Cooper also spoke with Plaintiff about the incident. All three men reported their findings to upper management. Hurtado, Cade and Cooper all recall a similar version of the incident, and all three testified that the incident left Zaucha upset, shaken, and crying, and that she felt threatened by Plaintiff. Management reviewed the findings of the investigations, as well as Plaintiff's lengthy

---

[13](...continued)
Salonis had any history of physical violence, or of refusing to follow his supervisors' instructions.

disciplinary record, and ultimately decided that, based on Plaintiff's overall disciplinary history, he should be terminated for repeated acts of disrespectful, disruptive and threatening behavior in the workplace. Plaintiff may not have agreed with the findings of the investigation or the decision to terminate him, but that is not the relevant inquiry. The only relevant question is whether the Defendant honestly believed its stated reasons for terminating Plaintiff. *See Humphries*, 474 F.3d at 407 ("This is not to say that merely pointing to an employer's shoddy investigatory efforts is sufficient to establish pretext. Erroneous (but believed) reasons for terminating am employee are not tantamount to pretextual reasons."). Here, Plaintiff has not presented any evidence indicating that Siemens management did not honestly believe that Plaintiff's overall disciplinary record warranted termination.

Plaintiff's only evidence that Defendant's proffered reasons for terminating Plaintiff but retaining Salonis are pretextual is an out-of-context statement from Hurtado's deposition testimony that Hurtado did not discipline Salonis because he did not witness the dispute. While Plaintiff's line of reasoning is somewhat unclear, it appears that Plaintiff's argument is that if Hurtado were consistent in his determination not to discipline an employee for any incident that he did not witness, then Plaintiff should not have been disciplined for the incident with Zaucha, which Hurtado did not witness either. Therefore, since Plaintiff was disciplined even though Hurtado did not witness the incident, any reason that Defendant gives for terminating Plaintiff must be a lie. The court fails to see how this establishes pretext. Even if Hurtado did have a personal policy not to discipline employees for incidents that he did not witness, it would be irrelevant with regard to Plaintiff's termination, as Hurtado did not participate in the final decision to terminate Plaintiff. The ultimate decision to terminate Plaintiff was made by Perlowski, Kentfield and Cooper; Hurtado did not have a say in the matter. Plaintiff has not made any other arguments that Defendant's stated reasons for terminating him were pretextual. Thus, as

Plaintiff has failed to offer evidence that a similarly situated employee who did not engaged in protected activity was treated more favorably than him or that Defendant's proffered reasons for terminating him were pretextual, Plaintiff has not established a retaliation claim under the indirect method.

## C.    Retaliatory Discharge

In view of the court's finding above that Defendant is entitled to summary judgment on Plaintiff's federal law claims, the court declines to exercise jurisdiction over his state law retaliatory discharge claim (Count V).  "It is the well-established law of [the Seventh Circuit] that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001) (citing 28 U.S.C. § 1367(c)(3)) (confirming that the court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction).  The retaliatory discharge claim rests on a relatively discrete allegation: that Defendant intentionally falsified income documents in order to assist a worker in qualifying for a government-subsidized benefits.  (Second Amended Complaint [corrected], ¶ 24.)  Nothing in the record before the court indicates that "the interests of judicial economy, convenience, fairness, or comity" counsel in favor of this federal court ruling on that claim after having dismissed all of his federal claims.  *See Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citation omitted). Count V is dismissed without prejudice.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment (36) is granted. Counts I-IV are dismissed with prejudice. Plaintiff's state law claim of retaliatory discharge (Count V) is dismissed without prejudice to proceeding on that claim in state court. The motion to strike (66) is stricken as moot.

ENTER:

Dated: March 30, 2007

_____

REBECCA R. PALLMEYER
United States District Judge